UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **VICENTE ARRAIGA ALVAREZ,** | Case No.: 16-CV-1302-CAB-NLS |
| Plaintiff, | **REPORT AND RECOMMENDATION FOR ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **DR. S. KO, M.D., et al.,** | (ECF No. 74) |
| Defendants. | |

Before the Court is Defendants' motion for summary judgment. ECF No. 74. For the reasons outlined below, the Court **RECOMMENDS** that the district judge **GRANT** Defendants' motion for summary judgment.

## I. PROCEDURAL BACKGROUND

Plaintiff Vicente Arriga Alvarez ("Plaintiff"), a prisoner proceeding *pro se* and *in forma pauperis*, filed this civil rights action alleging various claims arising from medical treatment he received during his incarceration for ongoing chest pains. Plaintiff claims that each of the Defendants were deliberately indifferent to his serious medical need, in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.

1

After the close of discovery, Defendants filed this motion for summary judgment seeking judgment in their favor on all claims. Defendants, and the Court, notified Plaintiff of the requirements for opposing summary judgment pursuant to *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988) and *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998) (en banc). ECF No. 76. The Court granted Plaintiff two extensions of time to file his opposition. ECF Nos. 75, 88. Plaintiff filed an opposition, and Defendants filed a reply. ECF Nos. 91, 92.

## II. FACTUAL BACKGROUND

### a. Plaintiff Complains of Chest Pains and Requests To See A Doctor

The first request in the record where Plaintiff asked for medical attention for chest pains was made on September 26, 2014, while Plaintiff was housed at Corcoran State Prison. ECF No. 74-3 at 24. At the time, Plaintiff was thirty years old. On the form, Plaintiff stated "I have real bad chest pains. I am constantly sneezing [and] coughing. I have real bad allergys [sic]." *Id.* The resolution on the medical slip indicated that Plaintiff was assessed on September 30, 2014 during the noon medicine pass. *Id.* The nurse's note from that visit indicated that Plaintiff also complained of a runny nose and was suffering from sneezing/nasal congestion and itchy throat. *Id.* at 25. The resolution on this initial request attributed the chest pain to coughing. *Id.* at 24.

Plaintiff submitted a second medical slip on October 24, 2014, complaining that he had been having heart problems for six months and chest pains for a month. *Id.* at 27. On October 26, 2014, Plaintiff saw a nurse. *Id.* The notes from the visit indicated that Plaintiff denied any history of heart problems and denied any accompanying symptoms, including nausea or vomiting. *Id.* at 28. Plaintiff admitted to doing a lot of exercise (including burpees). *Id.* at 30. The nurse prescribed him ibuprofen, told him to not do any excessive/strenuous exercise or

heavy lifting, and to follow-up with a physician if symptoms persist. *Id.* at 29-30. The nurse did not refer him to a physician at that time. *Id.* at 28.

### b. Plaintiff Files an Inmate Health Care Appeal

On November 2, 2014, Plaintiff submitted an inmate health care appeal (#COR HC 14057207). ECF No. 1 at Ex. E. He requested to be seen by a heart specialist and to receive a CAT scan. *Id.* The appeal was received on November 5, 2014.

### c. Plaintiff is Transferred to Centinela and Begins Treatment with Dr. Ko

On November 18, 2014, Plaintiff was transferred from Corcoran to Centinela State Prison. ECF No. 74-3 at 32. On December 10, 2014, Plaintiff was examined by Dr. Ko at Centinela for the first time. *Id.* The recorded purpose of the visit was because Plaintiff was a new arrival and was Hepatitis C positive. *Id.* However, during the visit, Dr. Ko also addressed Plaintiff's chest pains. Dr. Ko noted that Plaintiff stated the pains started about three months ago, that the pains did not radiate or cause any shortness of breath, and Plaintiff was sore in his left chest with pressure to the area. *Id.* Dr. Ko also noted that Plaintiff told him he did 100 push-ups every other day. *Id.* Dr. Ko assessed Plaintiff's heart rate at 80 that day, and noted that his heart had good rate and rhythm, normal S1 and S2 sounds with no murmurs, clicks, or rubs. *Id.* Dr. Ko noted that when he "palpate[s Plaintiff's] left pectoral chest area, it elicits tenderness." *Id.* Dr. Ko wrote that he believed that the chest pain was musculoskeletal in nature. *Id.* Dr. Ko ordered an EKG and encouraged Plaintiff to refrain from all high risk activities. *Id.* Dr. Ko also prescribed Naproxen. ECF No. 74-4, Declaration of Dr. Ko ("Ko Decl."), ¶ 7.

The EKG was performed on December 17, 2014. ECF No. 74-3 at 34. The EKG reported a rate of 56 beats per minute. *Id.* The EKG noted "sinus bradycardia" and "Normal ECG except for rate." *Id.* Dr. Ko reviewed the results

of the EKG and found the results to be normal for Plaintiff, a health young adult who exercises regularly.  Ko Decl., ¶¶ 9-10.

### d.    Corcoran Staff Review and Deny Plaintiff's 602 Appeal and His Request To See A Doctor  (<u>First Level</u>)

On December 18, 2014, S. Russell, a Health Care Appeals Coordinator, interviewed Plaintiff over the phone about the 602 Appeal, #COR HC 14057207, that Plaintiff previously submitted at Corcoran.  ECF No. 74-3 at 118.  Plaintiff requested that his health issues be considered an emergency, requested to be seen by a heart specialist, and requested diagnostic testing.  *Id.*  These requests were all denied because Plaintiff was no longer at Corcoran and so medical personnel at Corcoran cannot prescribe medication or treatment.  *Id.*  On December 22, 2014, Dr. McCabe signed Plaintiff's 602 Appeal denial at the first level.  *Id.* at 119.

On January 6, 2015, Plaintiff submitted his 602 Appeal for the next level of review.  ECF No. 1, Ex. E.  He argued his request to see a heart specialist should have been granted because his chest pains demonstrate a "significant illness."  *Id.*  This appeal was received on January 15, 2015 and was assigned to Dr. Ko for review.  *Id.*

### e.    Plaintiff Seen by Dr. Ko in the Triage and Treatment Area for Continued Chest Pains

On January 21, 2015, Plaintiff submitted another health care services request form, complaining of chest pain again.  ECF No. 74-3 at 35.  He was seen the next day by a nurse and by Dr. Ko.  *Id.* at 35-39.  The nurse's notes indicates that Plaintiff was experiencing unprovoked, non-radiating pain, was still exercising, and denied experiencing any shortness of breath.  *Id.* at 37.  Dr. Ko's notes indicate that Plaintiff told him he had been experiencing chest pain that has been constant 24 hours, 7 days a week for over three months.  *Id.* at 38.  Dr. Ko also noted that Plaintiff was exercising regularly, including doing 100 push-ups, 50 pull-ups, 100

burpees, and running the track every other day, and that Plaintiff's chest hurt right after doing upper body workouts. *Id.* Dr. Ko noted that Plaintiff did not have any nausea or vomiting, did not report experiencing shortness of breath, and did not have a history of cardiopulmonary issues. *Id.* That day, Plaintiff's pulse was recorded at 77, and heart sounds were all normal. *Id.* Another EKG was performed that day, which reported sinus rhythm and a normal ECG. *Id.* at 40. Dr. Ko again assessed Plaintiff's chest pain was musculosketal and that he was in no immediate danger. *Id.* at 38. Dr. Ko again prescribed naproxen and ordered absolute chest rest for at least 2-3 months. *Id.*

During this appointment, Dr. Ko and Plaintiff have a conversation regarding Plaintiff's dissatisfaction with the treatment. Dr. Ko's notes represented the conversation as follows:

> At the end of the visit, he tells me that he wants me to refer him to a cardiologist. I told him that I do not see any indication for that. I told him that the proper recourse if he feels like I am doing something wrong would be to write a 602. At this point he tells me that "What is it going to take for me to fall out?" I told him again if he feels like I am doing something wrong, he needs to put in a 602 as that would be his proper recourse.

ECF No. 74-3 at 38. On the other hand, Plaintiff represents that he asked Dr. Ko for a referral to a heart specialist and an x-ray but Dr. Ko said no and said that he would only give him naproxen and "if [he] had a problem with [t]his decision, [he] could file a 602." ECF No. 91, Declaration of Vicente Alvarez ("Alvarez Decl."), ¶ 7. Plaintiff represents that Dr. Ko gave him a napkin with his name on it so that he would have his name when he filed the 602. *Id.* ¶ 33; ECF No. 91, Ex. J.[1]

---

[1] On February 3, 2015, Plaintiff did file another 602 Appeal about Dr. Ko's alleged inadequate care. ECF No., Ex. E (referencing Log # CEN HC 1507230). On May 4, 2015, this additional appeal was denied and cancelled because it was duplicative of his previous 602 Appeal to see a heart specialist. *Id.*

**f.  Dr. Ko Interviews Plaintiff About His 602 Appeal, Log #
207; and Drs. Sangha and Reilly Review and Deny His
Appeal (Second Level)**

On February 4, 2015, Dr. Ko interviewed Plaintiff about his 602 Appeal,
#COR HC 14057207, at the second level of review.  ECF No. 74-3 at 41.  Because
of the administrative nature of this interview, Dr. Ko did not examine Plaintiff but
reviewed his medical records.  *Id.*  Dr. Ko noted that Plaintiff had two EKGs and
the results were normal and he saw no reason to refer him to a cardiologist.  *Id.*  He
also noted that he believes Plaintiff's chest pains have improved as he was reporting
having them once every hour lasting a few seconds, whereas he stated that they
were constant 24 hours a day, 7 days a week when he saw Plaintiff on January 22,
2015.  *Id.*

Plaintiff and Dr. Ko also have different accounts on what else happened at this
interview.  Dr. Ko's notes state that Plaintiff insisted on seeing a heart specialist or
a different doctor.  *Id.*  He represents that he explained that Plaintiff could see a
different doctor, but would be responsible for paying for that doctor and paying for
transport and custody to go to that appointment.  *Id.*  At this point, Dr. Ko states
that Plaintiff said "Now I understand why CDCR won't let me see a heart
specialist.  It's because it is going to cost a lot of money."  *Id.*  Dr. Ko states that he
explained to Plaintiff that was not the reason, and that he does have recourse if he
wants to see a different doctor but would have to self-pay.  *Id.*

According to Plaintiff, he told Dr. Ko the Naproxen was not working and that
a nurse previously told him his EKG showed an abnormal heart rate and that it was
a sign his heart was not properly working.  Alvarez Decl. ¶ 8.  He states that Dr. Ko
responded with a hostile attitude that nothing was wrong with his heart and that the
nurse did not know what he was doing.  *Id.*  Plaintiff states that he asked if he
needed to actually fall out from a heart attack to be referred to a heart specialist, and

Dr. Ko nodded his head up and down to respond "yes."[2]  *Id.* ¶ 9.  He states that Dr. Ko then told him that if he was not happy with the care he received, then he could seek medical care at his own expense, which would cost thousands of dollars.  *Id.* ¶ 10.  Plaintiff states that he then told Dr. Ko "now I see why you are depriving me of medical care, you are trying to save the state thousands of dollars that they are going to spend on me."  *Id.* ¶ 11.

On February 21, 2015, Drs. Sangha and Reilly partially granted and partially denied Plaintiff's appeal at the second level.  ECF. No. 1, Ex. B.  The appeal was partially granted on grounds that when Plaintiff arrived at Centinela he received two EKGs that returned normal.  *Id.*  The appeal was denied to the extent Plaintiff requested to see a cardiologist or get a CT scan.  *Id.*  On March 3, 2015, Plaintiff resubmitted his 602 Appeal for the third level of review.  ECF No. 1, Ex. E.

### g.   Plaintiff Sees Dr. Ko In the Ad-Seg Clinic and Again Requests to be Referred to a Heart Specialist

On May 3, 2015, Plaintiff submitted another request to see a doctor for his chest pains.  ECF No. 74-3 at 43.  He indicated that the pain comes and goes throughout the day and the Naproxen had not taken the pain away.  *Id.*  He was seen by the nurse the following day and by Dr. Ko two days later.  *Id.* at 43-45.  Dr. Ko's notes recorded his heart to have regular rate and rhythm with no murmurs or clicks or rubs.  Dr. Ko noted that while he told Plaintiff to rest his chest, he admitted to doing push-ups at least every other day, about 40-50.  *Id.*

Both Dr. Ko and Plaintiff state that Plaintiff continued to insist he needed to see a heart specialist and accused Dr. Ko of not caring about his condition.  *Id.* at 44-45; Alvarez Decl. ¶¶ 14-15.  Dr. Ko told Plaintiff that he did not see any medical indication that referral to cardiology was required.  ECF No. 74-3 at 44.  Dr. Ko

---

[2] While Plaintiff recollects the comment regarding him "falling out" happened at this interview, Dr. Ko's treatment notes indicates he made a similar statement at the January 22, 2015 appointment.  ECF No. 74-3 at 38.

stated that Plaintiff told him he did not want to take naproxen anymore and so instead, he offered him Tylenol, which Plaintiff did not want because it was weaker than Naproxen. *Id.* Dr. Ko reported that Plaintiff continued to ask for more tests and accused him of not knowing anything when he tried to explain to him that the tests were not necessary in his opinion and he believed Plaintiff's insistence that something was wrong with him was not in line with community medical standards. *Id.* Dr. Ko states that he told Plaintiff that it was not that he was not doing anything about the chest pains but that "as long as [Plaintiff] continues to do the upper body workouts with inflammation, musculoskeletal-wise, will not settle down." *Id.* at 45. Plaintiff states that he warned Dr. Ko that he would pursue a civil rights complaint for deliberate indifference to his medical needs because a reasonable doctor would not treat him that way. Alvarez Decl. ¶ 17; ECF No. 74-3 at 45. Plaintiff reports that Dr. Ko "sarcastically" responded that he would look forward to that day in court.[3] Alvarez Decl. ¶ 18. After the appointment, though Dr. Ko states that he believes it was not medically indicated in his opinion, he ordered a chest x-ray, CBC with differential, comprehensive metabolic panel, and erythrocyte sedimentation rate. ECF No. 74-3 at 45. Plaintiff underwent a chest x-ray on May 7, 2018. The results were unremarkable and no acute cardiopulmonary disease was identified. ECF No. 74-3 at 46. Plaintiff also underwent laboratory testing on May 11, 2015, with normal results as well. ECF No. 74-3 at 47.

//

//

---

[3] On May 5, 2015, Plaintiff filed another 602 Appeal, Log # CEN HC 15027248, to again request to be seen by another doctor or heart specialist, and to complain about Dr. Ko's alleged deliberate indifference to his medical needs. ECF No. 1, Ex. E. On May 26, 2015, Dr. Ko interviewed Plaintiff about this 602 Appeal and his request to see another doctor or heart specialist and subsequently denied the request. *Id.* It does not appear that this 602 progressed beyond the first level.

### h. Deputy Director J. Lewis Reviews And Denies Plaintiff's 602 Appeal, Log #207 (Third Level)

On June 1, 2015, Deputy Director Lewis denied Plaintiff's 602 Appeal, #COR HC 14057207. ECF No. 1, Ex. A. The decision reviewed Plaintiff's medical records and his test results (including the EKGs, chest x-ray, and laboratory results), and concluded Plaintiff was getting adequate care and there was no indication from any test results that further consultation with a cardiologist was needed. *Id.* at 2.

### i. Plaintiff Goes to the Emergency Room and Follows-up at Centinela

On July 5, 2015, Plaintiff arrived at the Triage and Treatment unit in a gurney, complaining of chest pain to his upper chest and abdominal pain in his lower quadrant. ECF No. 74-3 at 48-49. An EKG was performed that showed sinus rhythm and normal results. *Id.* at 50. The on-call doctor prescribed aspirin and sent him to the emergency room for cardiac evaluation. *Id.* at 49.

At the emergency room, Plaintiff was examined and monitored. He reported that he was experiencing chest pain that radiated to the left arm and back, and the pain was sharp, like "little shocks." *Id.* at 51. He reported nausea but no shortness of breath. *Id.* His heart rate was monitored to be normal and rhythm to be regular. *Id.* at 51-52. He received another EKG and the results were interpreted as "Normal ECG and No evidence of ischemia." *Id.* at 52-53. He also received several other tests, including a chest x-ray, that all returned "normal." *Id.* at 53.

Plaintiff was discharged about two hours later, with a diagnosis of "atypical chest pain,[4] GERD."[5] *Id.* at 54, 56-57. He was prescribed Prilosec (omeprazole)

---

[4] Atypical chest pain is chest pain that is not likely to be of cardiac origin. *See* ECF No. 74-3, Declaration of Bennett Feinberg, at 10.
[5] GERD is gastroesophageal reflux disease, commonly known as acid reflux and occurs when stomach acid comes back up through the esophagus. The condition causes heartburn and indigestion, among other symptoms. GERD is

(continued…)

9

for the GERD. *Id.* Follow-up instructions ordered him to follow-up with a physician in 2-3 days, with no mention of a heart specialist. *Id.*

On July 6, 2015, Plaintiff was seen back at Centinela by Dr. Ortega for follow-up. ECF No. 74-3 at 61-62. Dr. Ortega's notes review his medical history, and assesses that Plaintiff does not have a "cardiac type chest pain" given his history and presentation and that "his pulmonary examination including chest x-ray is also reassuring and unremarkable." *Id.* at 61. Dr. Ortega noted that Plaintiff has a "vague sensation of discomfort in the midepigastric area" and that this "very well may be peptic ulcer disease symptom." *Id.* Thus, he ordered H. pylori antigen and stool testing, told Plaintiff to stop drinking coffee, and continue to take omeprazole. *Id.* Dr. Ortega indicated that he "assure[d Plaintiff] that his physical examination findings and his history all point to no serious disease" and that Plaintiff has "very atypical features for pulmonary cardiovascular pathology at this time." *Id.*

On August 18, 2015, Plaintiff was seen again for chest pain complaints. ECF No. 74-3 at 63. The physician's assistant reviewed Plaintiff's records and conducted a physical examination, finding nothing remarkable. *Id.* To address his chest discomfort complaint, he ordered a lipid panel. *Id.* The lipid panel was performed two weeks later, with results all within expected range. *Id.* at 64.

### j.     Plaintiff is Transferred Back to Corcoran

Shortly after on September 9, 2015, Plaintiff is transferred back to Corcoran State Prison from Centinela. He is first seen as a new arrival on September 30, 2015 by medical staff there. ECF No. 74-3 at 65. Plaintiff's history of chest pain is noted but the treatment notes only include the GERD diagnosis with a treatment plan. *Id.*

---

(…continued)
often treated with medication such as antacids or proton pump inhibitors such as lansoprazole or omeprazole.

Plaintiff began treatment with Dr. Metts as his primary care physician after his transfer. On April 26, 2016, Plaintiff saw Dr. Metts, complaining of chest pains. ECF No. 74-3. Dr. Metts reviewed his history, noting that the past EKGs were normal and his lipid panel results were very good. *Id.* He ordered another EKG, which was performed two days later on April 28. *Id.* The EKG measured his heart rate at 57, with notes stating "sinus bradycardia; otherwise normal ECG." *Id.* at 67. Plaintiff saw Dr. Metts again on June 6, 2016 with continued complaints of chest pain. *Id.* at 68. Dr. Metts noted that chest pains were "not likely cardiac, possible chest wall pain." *Id.* He prescribed prednisone and salsalate. *Id.* Plaintiff saw Dr. Metts for follow-up on 7/25/2016 for continued chest pains. *Id.* at 69. Dr. Metts again noted that his past EKGs have shown "no significant pathology" but that NSAIDs (which would include naproxen, aspirin, and the like) did not help. *Id.* Dr. Metts ordered a treadmill test at this appointment. *Id.* at 70. The results were reviewed at his next visit on September 26, 2016, where Dr. Metts indicated that the treadmill test results showed no evidence of ischemia and showed that he had good exercise capacity. *Id.* at 72. The treatment plan stated chest x-ray and ESR test. *Id.* Dr. Metts saw Plaintiff again on October 20, 2016. *Id.* at 74. The treatment notes state "chest pain no cardiac" with plan of trial of omeprazole. *Id.* The next visit on January 25, 2017 indicated that Plaintiff's chest pains stopped with the omeprazole. *Id.* at 75.

### k.  Plaintiff Files His Civil Rights Complaint

On May 31, 2016, Plaintiff filed a Complaint against Defendants. Plaintiff alleges Eighth Amendment claims for deliberate indifference to his serious medical needs. ECF No. 1 at 17-22. Plaintiff seeks monetary damages and injunctive relief. He asks the Court to issue an order requiring Defendants to stop their ineffective course of treatment, and to order diagnostic tests for cardiac disease or refer him to a heart specialist. *Id.* ¶ 97.

### III. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex. Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The moving party can establish an absence of a genuine issue of material fact by (1) presenting evidence that negates an essential element of the non-moving party's case; or (2) demonstrating that the nonmoving party failed to establish an essential element of that party's case. *Celotex*, 477 U.S. at 322-323. The moving party must identify the pleadings, depositions, affidavits or other evidence that the party "believes demonstrates the absence of a genuine issue of material fact." *Id.* at 323. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets its burden, the non-moving party must "go beyond the pleadings and by his own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. V. Cities Serv. Co.*, 391 US. 253, 289 (1968)). In making this determination, the court must view the underlying facts in the light most favorable to the party opposing the motion. *Id.* The court should not engage in

credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. *Anderson*, 477 U.S. at 255.

## IV.  Discussion

### a.  Eighth Amendment Deliberate Indifference Claim as to Defendant Ko

The Eighth Amendment protects prisoners from "inhumane conditions of confinement." *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006). Consequently, the government must "provide medical care for those whom it is punishing by incarceration," and cannot act with deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A prison official acts with deliberate indifference if the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Deliberate indifference is also known as the "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104 (internal quotations omitted).  To prevail, a plaintiff must make (1) an objective showing that he had a serious medical need; and (2) a subjective showing that the specific defendants were deliberately indifferent to that need. *See id.; Farmer*, 511 U.S. at 837-38; *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014).

Deliberate indifference is shown where the official is aware of a serious medical need and fails to adequately respond. *Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1018 (9th Cir.2010).  "Deliberate indifference is a high legal standard." *Id.* at 1019; *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir.2004). "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106; *see also Anderson v. County of Kern*, 45 F.3d 1310, 1316 (9th Cir.1995).  Even gross

negligence is insufficient to establish deliberate indifference to serious medical needs. *See Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir.1990).

The subjective showing requires a showing that the individual acted with deliberate indifference. *Toguchi*, 391 F.3d at 1057. The prison official "must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Id.* (*quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). In other words, an inadvertent failure to provide adequate medical care, negligence, a mere delay in medical care (without more), or a difference of opinion over proper medical treatment, all are insufficient to constitute an Eighth Amendment violation. *See Estelle*, 429 U.S. at 105-07; *Toguchi*, 391 F.3d at 1059-60. Rather, deliberate indifference requires more, such as a showing of intentional denial, delay or interference with a plaintiff's medical care. *See Estelle*, 429 U.S. at 104-05.

Here, with these guiding principles in mind, the undisputed material facts demonstrate Plaintiff cannot establish that Dr. Ko was deliberately indifferent to his medical needs. The medical records in this case contradict Plaintiff's argument that Dr. Ko did little more than prescribe him naproxen and then Tylenol. ECF No. 91 at 14. Dr. Ko first saw Plaintiff on December 10, 2014 and ordered an EKG that same visit. ECF No. 74-3 at 32. He examined Plaintiff, listened to his heart, palpated Plaintiff's chest area and assessed that the chest pains were likely musculoskeletal. *Id.* At the end of the visit, he prescribed naproxen. *Id.* Dr. Ko reviewed the EKG results and though it reported a slightly lower than normal heart rate (57 bpm versus 60 bpm), found it to be normal based on Plaintiff's other health factors. Ko Decl. ¶¶ 9-10. At the next visit on January 21, 2015, Dr. Ko physically examined Plaintiff, looked for other warning signs (nausea, vomiting, shortness of breath), and ordered another EKG, which returned normal. ECF No. 74-3 at 35-40. While Dr. Ko continued to prescribe naproxen despite the reports of continued

chest pain, he also ordered absolute chest rest for Plaintiff who he noted was still exercising regularly. *Id.* at 38. When Plaintiff saw Dr. Ko again for chest pains on May 3, 2015, Dr. Ko examined Plaintiff again, finding nothing remarkable, and though he did not believe it was medically necessary, ordered several tests, including a chest x-ray and comprehensive metabolic panel. ECF No. 74-3 at 43-47. The rest results all came back normal. *Id.* at 46-47. Throughout Dr. Ko's contemporaneous treatment notes, he made clear that he was convinced that there was no medical evidence to indicate that Plaintiff's chest pains were cardiac in nature and that Plaintiff needed to be referred to cardiologist. *Toguchi*, 391 F.3d at 1060 (doctor was not "subjectively aware" of substantial risk of serious harm to inmate where evidence shows that doctor believed her diagnosis was correct); *Coyle v. Cambra*, No. C 02-1810 SBA PR), 2005 WL 2397517, at *9 (N.D. Cal. Sept. 27, 2005) (doctor was not "subjectively aware" of serious medical need for orthopedic consultation where x-ray results were normal).

While Plaintiff consistently complained of continued chest pains, the medical record shows that he has been examined, prescribed medication, and undergone several diagnostic tests, which all returned results the doctor reviewed as normal. *See Jio v. Nolen*, No. 08-cv-358, 2009 WL 175844 (E.D. Tex. Jan 23, 2009) (deliberate indifference not found where plaintiff's repeated complaints of chest pains were "consistently responded through the running of diagnostic tests and the provision of various medications in an effort to provide treatment"). Contrary to the Plaintiff's position, Dr. Ko did not simply stand by or intentionally withhold treatment from Plaintiff. Plaintiff's complaints that more could have been done— such as referral to a cardiologist or more diagnostic tests earlier on during treatment—is insufficient to establish deliberate indifference. Nor is Plaintiff's complaint that the prescribed treatment of naproxen was ineffective. *Id.* ("[M]ere disagreement with medical treatment received or a complaint that the treatment was

not successful does not amount to a showing of deliberate indifference to a serious medical need."). Moreover, Dr. Ko's treatment notes make clear that he did not repeatedly prescribe naproxen despite knowing that it was ineffective to treat Plaintiff's chest pains. Rather, his subjective belief appeared to be that Plaintiff was not refraining from exercise and chest rest as he ordered, which could interfere with the planned treatment. *See* ECF No. 74-3 at 32, 38, 44-45; *Williams v. Shelton*, No. No. 06-cv-95-KI, 2008 WL 2789031, at *2 (D. Or. 2008) (delay in treatment did not amount to deliberate indifference where plaintiff contributed to the delay by not following doctor's orders).

The crux of Plaintiff's motion is premised on his belief that the mild bradycardia indicated on one of his EKGs necessarily equates to him having a heart condition. *See* ECF No. 91 at 15, 18. Specifically, Plaintiff points to two things as evidence of this: (1) his December 17, 2014 EKG (ECF No. 91 at 65; ECF 74-3 at 34), and (2) the CCHCS RN Protocol on Chest Pain (ECF No. 91 at 88-89). First, while the EKG does state "sinus bradycardia" and "Normal ECG except for rate" (showing a rate of 56 beats), it standing alone does not establish that Plaintiff suffered from any serious heart condition. Dr. Ko testified that "[a] resting heart rate slower than 60 beats per minute is normal for some people, particularly healthy young adults who exercise regularly, such as Plaintiff" and "mild bradycardia is not considered a health problem." Ko Decl. ¶¶ 9-10. Defendants' expert Dr. Feinberg agreed. ECF No. 74-3, Ex. 2, Declaration of Bennett Feinberg ("Feinberg Decl.") at 6 n.3 (stating same). Moreover, this appears to be widely recognized in the medical community and even in case law. *See Jio*, 2009 WL 175844, at *1 n.2 ("Sinus bradycardia is a regular but unusually slow heart rate. It can have a number of possible causes, including good physical fitness, because fit hearts can pump enough blood in each contraction; it is not necessarily a sign of illness or that something is wrong.") (citing MedTerms Medical Dictionary's definition of "sinus

bradycardia," available at

https://www.medicinenet.com/script/main/art.asp?articlekey=19707). Aside from his own belief, Plaintiff also states that a nurse told him that his EKG results were abnormal and that "it was a sign that his heart was not properly working," and that he told Dr. Ko about this comment but Dr. Ko ignored it. ECF No. 91 at 16. But at best, this may show a difference of medical opinion, which does not arise to deliberate indifference. *See Estelle*, 429 U.S. at 105-07. Second, Plaintiff misreads the CCHCS Protocol—it only states that Acute Coronary Syndrome (ACS) frequently presents with bradycardia; it does not state that bradycardia on an EKG sufficiently establishes that Plaintiff had ACS. In sum, while Plaintiff clearly believed he had bradycardia and therefore, a heart condition, Dr. Ko was under no obligation to accept this lay self-diagnosis for the purposes of treatment. *See Coyle*, 2005 WL 2397517, at *9.

Plaintiff also testified that Dr. Ko made several hostile comments to him on a couple of different occasions that showed deliberate indifference. Specifically, Plaintiff testified that during the January 22, 2015 appointment, Dr. Ko told him that if he disagreed with his opinion that he did not need a cardiologist, he should file a 602 and he gave Plaintiff a napkin with his name written on it ("Ko") so Plaintiff would not misspell his name. Alvarez Decl. ¶ 7. Plaintiff also testified that during his February 4, 2015 interview with Dr. Ko regarding his 602 appeal, he asked Dr. Ko if "he actually wanted [Plaintiff] to fall out of a heart attack so that he may refer me to a specialist" and Dr. Ko "nodded his head up and down slowly saying 'yes.'" *Id.* ¶ 9. During this same meeting, Plaintiff testified that Dr. Ko told him that if he was not happy with his care, he could go seek medical care elsewhere at his own expense and that it would cost thousands of dollars because he would have to pay for transportation and tests himself. *Id.* ¶ 10. Finally, Plaintiff testified that at his May 5, 2015 appointment, when he told Dr. Ko that he would file a civil

rights complaint, Dr. Ko told him "that's fine sir, I will be looking forward to that day in court sir." *Id.* ¶¶ 17-18.   Dr. Ko has a different account of these conversations at each of these meetings, but even assuming Plaintiff's version of events as he is the non-moving party, these statements do not show that Dr. Ko was deliberately indifferent to Plaintiff's medical complaints given the treatment he did provide as outlined above.   While these statements may have been offensive to Plaintiff, inappropriate, and unprofessional, Plaintiff has not shown that the actions that Dr. Ko took to diagnose or treat him were medically unsupported and arose to deliberate indifference. *See Jio*, 2009 WL 175844, at *5 (doctor's "verbal expression of frustration over the fact that [patient] complained of chest pain but repeated tests had shown nothing is not a constitutional violation in light of the fact that by his actions, [the doctor] showed that he was not deliberately indifferent to [patient's] medical needs"); *cf Oltarzewski v. Ruggiero,* 830 F.2d 136, 139 (9th Cir.1987) ("verbal harassment or abuse . . . is not sufficient to state a constitutional deprivation under 42 U.S. § 1983"); *Bender v. Brumley,* 1 F.3d 271, 274 n.3 (5th Cir. 1993) (language and gestures by correctional staff do not amount to constitutional violations).   And while Plaintiff is correct that cost and budgetary constraints do not justify cruel and unusual punishment (*see Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986)), the record demonstrates that this is not what happened here.   The record here demonstrates Dr. Ko provided treatment and the decision of whether to send him to a cardiologist and for additional testing amounted to a difference of opinion between Dr. Ko and Plaintiff.   There is no evidence that Dr. Ko knew Plaintiff needed these additional services and denied them simply to save money.   Plaintiff's own statement that Dr. Ko denied him services to "save the state thousands of dollars that they are going to spend on" him is insufficient to create a dispute of material fact. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in

1  affidavits and moving papers is insufficient to raise genuine issues of fact and
2  defeat summary judgment.").

3      While Plaintiff did get sent to the emergency room for chest pains on July 5,
4  2014 and his current doctor, Dr. Metts, has provided additional testing (such as the
5  treadmill test) to Plaintiff, at most, these may signal a difference of medical opinion
6  with Dr. Ko. Where there are "alternative courses of treatment, [the] prisoner must
7  show that the chosen course of treatment 'was medically unacceptable under the
8  circumstances' and was chosen 'in conscious disregard of an excessive risk to the
9  prisoner's health." *Toguchi*, 391 F.3d at 1058. The record is devoid of any
10  evidence that Dr. Ko's treatment plan was medically unacceptable. Expert
11  testimony corroborates that Dr. Ko's treatment and diagnosis was reasonable for
12  someone with Plaintiff's medical history and presentation. Feinberg Decl. at 20.
13  Moreover, all of the doctors that treated Plaintiff (including Dr. Kajitani from his
14  emergency room visit, Dr. Ortega, or Dr. Metts) agreed with Dr. Ko's diagnosis
15  that the chest pains were not of cardiac origin.

16      The most recent medical records in front of the Court from Plaintiff's
17  treatment with Dr. Metts seems to suggest that Plaintiff's chest pains have subsided
18  with the GERD treatment. ECF. No. 74-3 at 74-75. Even if the root cause of
19  Plaintiff's chest pains were due to GERD, rather than musculoskeletal like Dr. Ko
20  believed, this does not arise to the level of deliberate indifference either. The
21  misdiagnosis may have been an indication that Dr. Ko was negligent, but
22  negligence does not constitute deliberate indifference. *Estelle*, 429 U.S. at 106-07.

23      Plaintiff additionally argues that Dr. Ko did not follow protocol by failing to
24  follow-up with him in the recommended number of days. ECF No. 91 at 16.
25  However, even assuming that Dr. Ko should have followed-up but failed to, this
26  does not rise to the level of being deliberately indifferent to Plaintiff's medical
27
28

needs.  At most, it might suggest that Dr. Ko was possibly negligent, but again, that does not constitute deliberate indifference.  *Estelle*, 429 U.S. at 106-07.

When viewed as a whole, there is no dispute of material fact as to whether Dr. Ko acted with deliberate indifference to Plaintiff's medical needs.  Dr. Ko examined Plaintiff, prescribed him the medications he thought were necessary, and never believed that Plaintiff needed to see a cardiologist or undergo further testing.  The Court concludes summary judgment should be granted in favor of Dr. Ko on Plaintiff's Eighth Amendment claim.

### b.    Eighth Amendment Deliberate Indifference Claim as to Defendants McCabe, Sangha, and Lewis

A plaintiff may state a claim under § 1983 against a supervisor for deliberate indifference.  *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011).  Supervisory officials cannot be held liable for actions of subordinates under vicarious liability.  *Crowley v. Bannister*, 734 F.3d 96, 977 (9th Cir. 2013).  However, "[a] defendant may be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."  *Starr*, 652 F.3d at 1207 (citation omitted).  In order to demonstrate the sufficient causal connection, "a plaintiff must show the supervisor breached a duty to plaintiff which was the proximate cause of the injury."  *Id.* (*quoting Redman v. Cnty. Of San Diego*, 942 F.2d 1435, 1447 (9th Cir. 1991)).  "'The requisite causal connection can be established . . . by setting in motion a series of acts by others,' . . . or by 'knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury.'"  *Id.* at 1207-08 (internal citations omitted and alteration in original).  "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his

subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1208 (*quoting Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)).

### i.    Dr. McCabe

It is not disputed that Dr. McCabe never personally treated Plaintiff, and it is not disputed that Dr. McCabe was not Dr. Ko's supervisor. Dr. McCabe was the individual who reviewed and denied Plaintiff's 602 at the first level of review on December 19, 2014. ECF No. 74-3 at 118-19. After reviewing S. Russell's interview with Plaintiff and reviewing Plaintiff's medical records, Dr. McCabe denied the appeal primarily on the basis that Plaintiff had transferred to Centinela at that point in time so Corcoran medical officials could no longer administer his care and he was already receiving medical care at Centinela. *Id.*

Liability is generally not imposed on a medical officer who only acted to review and deny an inmate appeal. *See, e.g., Vasquez v. Tate*, 2013 WL 1790143, at *8 (E.D. Cal. Apr. 26, 2013), *citing Koch v. Neubarth*, 2009 WL 4019616, at *5 (E.D. Cal. 2009). However, "a medically-trained individual who is made aware of serious medical needs through reviewing a prisoner's appeal may be liable for failure to treat those needs." *Rapalo v. Lopez*, No. 11-CV-01695, 2017 WL 931822, at *17 (E.D. Cal. Mar. 9, 2017); *see also Pogue v. Igbinosa*, 2012 WL 603230, at *9 (E.D. Cal. Feb. 23, 2012) ("emerging consensus, therefore, is that a medically-trained official who reviews and denies an appeal is liable under the Eighth Amendment when a plaintiff can show that the official knew, at least in part, from reading the appeal that the plaintiff had a serious medical issue and nevertheless chose not to offer treatment").

In his 602, Plaintiff did explain his chest pains and his fear that they were indicative that something was seriously wrong with his heart and he needed medical attention. ECF No. 1, Ex. E, at 66. However, Dr. McCabe in his review noted that

Plaintiff had been evaluated twice at Corcoran and that since his subsequent transfer to Centinela, he was also evaluated on December 10, 2014 at his new institution. ECF No. 74-3 at 118. Dr. McCabe may rely on those medical assessments, which did not diagnose Plaintiff with a serious cardiac heart condition, without being deliberately indifferent to his care. *Rapalo*, 2017 WL 603230, at *9 (appeals reviewed had "a right to rely on the judgment of Plaintiff's treating physicians"); *Garrett v. Haar*, No. CV 16-9668-CAS (JPR), 2017 WL 5634612, at *4 (C.D. Cal. Oct. 13, 2017) (reviewer did not "consciously disregard an excessive risk to Plaintiff's health by relying on [prior] medical assessments"). Plaintiff argues that Dr. McCabe reviewed his health record and that would have included the EKG that was performed on December 17 with the "sinus bradycardia" notation, which should have alerted Dr. McCabe that something was wrong. ECF No. 91 at 20. However, as explained above, this EKG result does not necessarily indicate Plaintiff had a serious heart condition.

Plaintiff also argues that Dr. McCabe was the head doctor at Corcoran and was still responsible for Plaintiff's health care even after he transferred out to Centinela. ECF No. 91 at 19. However, besides Plaintiff's own self-serving statements, he has come forth with no evidence that Dr. McCabe's responsibilities reached so far. As evidence, Plaintiff cites Dr. McCabe's answer to Request for Admission 12 (ECF No. 91, Ex. P at 6) but this question asks Dr. McCabe to admit that once a prisoner transfers to another institution, the prisoner is entitled to receive medical care pursuant to the Inmate Medical Service Policies and Procedures for California Correctional Health Care Services ("CCHCS"). It does not establish that Dr. McCabe had any personal responsibility or connection to maintaining Plaintiff's care. Plaintiff similarly cites to CCHCS policies generally and to the section regarding pharmacy services (ECF No. 91, Exs. N and O), but these are again generalized sections about what care inmates are to be provided with and do not

state anything significant about Dr. McCabe's personal responsibilities. Moreover, when he denied the appeal, Dr. McCabe specifically noted that Plaintiff had been seen at Centinela on December 10—a visit with Dr. Ko where Plaintiff's chest pains were evaluated and an EKG was ordered. Nothing in the 602 or appeals decision indicates that Dr. McCabe would think Plaintiff was not receiving continued care after the transfer.

The Court concludes summary judgment should be granted in favor of Dr. McCabe on Plaintiff's Eighth Amendment claim.

### ii. Defendant Sangha

It is not disputed that Defendant Sangha did not personally treat Plaintiff, but Plaintiff argues that it was Dr. Sangha's duty to supervise Dr. Ko. ECF No. 91 at 21. Specifically, Plaintiff argues that it is reasonable to infer that Dr. Sangha was the "Pharmacist-in-charge" and it was his duty to supervise Dr. Ko and all of Dr. Ko's clinical decisions. *Id.* The Court fails to find that the evidence and exhibits that Plaintiff cites support this inference—there is nothing in Exhibit O that suggests that Dr. Sangha is the pharmacist-in-charge or that even if he were, he would therefore be responsible for supervising Dr. Ko. *See* ECF No. 91 at 105-110. Dr. Sangha testified that he did not supervise Dr. Ko or any of his clinical care decisions. ECF No. 74-7, Declaration of Dr. Sangha, ¶ 3. Even if Dr. Sangha was somehow in charge of supervising Dr. Ko, as discussed above, there is no liability because Dr. Ko's actions were not unconstitutional.

Rather, Dr. Sangha's involvement in Plaintiff's care is limited to the second level review of his 602 appeal. In that second level decision, he reviewed Plaintiff's medical records and summarized that each time Plaintiff was seen, his vitals were normal and the examination gave no signs or symptoms of cardiac problems. ECF No. 1, Ex. B at 1. He further noted that Plaintiff was examined by Dr. Ko twice, Dr. Ko ruled his chest pains musculoskeletal in nature, and that

Plaintiff's two EKGs from each of these visits (taken on 12/17/2014 and 1/22/2015) were both normal. *Id.* at 2. As explained above, Dr. Sangha is entitled to rely on the examining doctor's judgment. *See Rapalo*, 2017 WL 603230, at *9; *Garrett*, 2017 WL 5634612, at *4. In addition, Dr. Sangha noted that Plaintiff was prescribed Naproxen and was instructed to chest rest. There is no evidence to suggest that Dr. Sangha had any indication that Plaintiff was suffering from a medical need that was being ignored and not treated.

The Court concludes that Dr. Sangha was not deliberately indifferent to Plaintiff's medical needs and therefore, summary judgment should be granted in favor of Dr. Sangha on Plaintiff's Eighth Amendment claim.

### iii.    Defendant Lewis

Finally, as to Defendant Lewis, Plaintiff similarly fails to offer any evidence that she was deliberately indifferent to his medical needs. Director Lewis is the Deputy Director of Policy and Risk Management Services, and specifically manages the Health Care Correspondence and Appeals Branch. ECF No. 74-5 at 1. In this role, she oversees staff who process the lower level appeals and helps to process the final third level appeals. *Id.* ¶ 3. Director Lewis performed the third level review of Plaintiff's appeal after reviewing and summarizing the examinations performed, treatments provided, and tests performed on Plaintiff (which by that time included a chest x-ray and laboratory bloodwork in addition to the EKGs). ECF No. 1, Ex. A at 1-2. Director Lewis additionally noted that though Plaintiff was ordered to be on chest rest, he admitted to being non-compliant by continuing to do upper body workouts. *Id.* at 2. Based on her review, Director Lewis denied the appeal because Plaintiff was routinely being examined and monitored. *Id.* Nothing in Director Lewis's conduct during her final level review indicates that she had any reason to belief that Plaintiff's medical needs were not attended to and she needed to intervene. Plaintiff argues in his opposition that Director Lewis should

be held liable because Dr. Ko's alleged misconduct occurred at her direction or with her knowledge and consent. But Plaintiff's arguments as to his direction and knowledge/consent all relate back to review of the appeal. *See* ECF No. 91 at 20-22. Plaintiff has not come forth with any additional evidence that connects Director Lewis to Dr. Ko's alleged unconstitutional conduct. Accordingly, summary judgment should be granted in favor of Director Lewis.

### c.    Qualified Immunity

Finally, Defendants argue that they should be entitled to qualified immunity even if their conduct was unconstitutional. ECF No. 74-1 at 1-20. Because the Court has found no triable issue regarding the alleged violations of Plaintiff's Eighth Amendment rights, the Court need not reach any issues regarding qualified immunity. *See County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all."); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001). However, the Court will briefly address Defendants' qualified immunity argument.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth two questions to be considered in determining whether qualified immunity exists. First, the court considers the threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. Second, if a constitutional right was found to be violated, the next step is to ask whether the right was clearly established. *Id.* The Supreme Court has clarified since *Saucier* that it is in the

sound discretion of the district court to "decid[e] which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

To be clearly established, a right must be sufficiently clear "that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The level of generality at which the "right" alleged to be violated is considered must not be too high and divorced from the specific conduct at issue. *Anderson*, 483 at 639-40; *al–Kidd*, 563 U.S. at 742 ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality."). The dispositive inquiry is "whether the violative nature of particular conduct is clearly established" and it must be examined "in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741; *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867, 198 L. Ed. 2d 290 (2017) ("an officer might lose qualified immunity even if there is no reported case directly on point . . . [b]ut in the light of pre-existing law, the unlawfulness of the officer's conduct must be apparent.") (internal citations omitted).

Here, for the reasons outlined above, the Court finds that Defendants' conduct does not violate Plaintiff's constitutional right under the Eighth Amendment. Assuming arguendo that the conduct did, however, the right has not been demonstrated to be clearly established.

Plaintiff bears the burden of demonstrating that the right at issue here was clearly established. *Kramer v. Cullinan*, 878 F.3d 1156, 1164 (9th Cir. 2018); *Alston v. Read*, 663 F.3d 1094, 1098 (9th Cir. 2011). First, Plaintiff argues that

deliberate indifference to an inmate's serious medical need is a clearly established constitutional right. ECF No. 91 at 24. However, Plaintiff fails to analyze any of the cases he cites for this proposition any deeper than just for this "broad general proposition" and does not show their application to the "specific context of th[is] case."[6] *See Mullenix*, 136 S. Ct. at 308. Second, Plaintiff cites to the case *Jett v. Penner*, 439 F.3d 1091, 1097-98 (9th Cir. 2006), which he claims to be relevant to the facts of this case because it shows that a prison official demonstrates deliberate indifference when he or she knows that a course of treatment is ineffective and continues it anyway. *Jett* involved a plaintiff who had a fractured thumb, and despite the doctor recognizing that he needed to see an orthopedist, the doctor delayed sending him to one for months. *Id.* This case is sufficiently factually different from Dr. Ko's conduct—where he examined Plaintiff, ordered EKGs, never believed that Plaintiff needed a cardiologist, and believed that Plaintiff was not following his treatment plan—where it would not have put him on notice that his actions amounted to deliberate indifference.

---

[6] Plaintiff cites to three cases for this proposition, and none of them are sufficiently factually analogous that it would be apparent to Defendants that their actions were unconstitutional. While *Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005) did involve a plaintiff who complained of chest pains, only one of the defendant nurses was found to have acted with deliberate indifference. That nurse (Ms. Weldon) had told the plaintiff that there was nothing she could do about her severe chest pains until the next morning because the infirmary was closed and did nothing to examine the plaintiff that evening. *Id.* at 755-56. Here, Dr. Ko did examine Plaintiff, ordered EKGs, and treated him and was in fact more factually similar to the other nurses, in particular Ms. Hough, who administered EKGs to the *Mata* plaintiff and was found to not be deliberately indifferent. *Id.* at 759. Similarly, while the seminal case *Estelle v. Gamble*, 429 U.S. 9 (1976) established the standards for showing deliberate indifference in the medical context, the facts of the case involved a plaintiff who suffered from a back injury and the Supreme Court actually held that his claims were not cognizable against his treating doctors because the plaintiff saw a number of doctors who treated his back pain. *Id.* at 107. In fact, the *Estelle* plaintiff made similar complaints that he should have received more x-rays and additional diagnostic tests, but the Court rejected that this amounts to cruel and unusual punishment. *Id.* Finally, *Farmer v. Brennan*, 511 U.S. 825 (1994) dealt with whether prison officials were deliberately indifferent to the transsexual plaintiff's safety when they transferred him to general population and did not deal with medical deliberate indifference.

### V.  Conclusion

For the foregoing reasons, the Court **RECOMMENDS** that Defendants' Motion for Summary Judgment be **GRANTED**. This report and recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that no later than April 27, 2018, any party to this action may file written objections and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections must be filed and served on all parties no later than May 11, 2018. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

**IT IS ORDERED.**

Dated:  April 6, 2018

Hon. Nita L. Stormes
United States Magistrate Judge